# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ATOUSA VALI SICHANI, PH.D. <br> 10824 Antigua Terrace <br> North Bethesda, Maryland 20852 <br><br>     Plaintiff, <br><br> v. <br><br> WASHINGTON METROPOLITAN AREA <br> TRANSIT AUTHORITY, <br> 300 7th Street, S.W., Washington, D.C. 20024, <br><br>     Serve: <br> John F. Martin, Esquire <br> Ogletree, Deakins, Nash, Smoak & Stewart, P.C. <br> 1909 K Street, N.W., Suite 1000 <br> Washington, D.C. 20006 <br><br>     Defendant. | Case No. 1:22-cv-1584 <br><br><br> JURY TRIAL DEMANDED |

## COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE RELIEF AND DAMAGES

COMES NOW, Plaintiff, ATOUSA VALI SICHANI (hereinafter "Dr. Vali" or "Plaintiff") by and through counsel, Eric L. Siegel of Kalbian Hagerty, LLP, and hereby files this action against the Washington Metropolitan Area Transit Authority (hereinafter "WMATA" or "Defendant"), and for cause states:

## JURISDICTION AND VENUE

1.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332.

2.     Venue is proper under 28 U.S.C. §§ 1391(b) because a substantial part of the decisions and/or events giving rise to Plaintiff's claims occurred in the District of Columbia.

3.     Moreover, Defendant's main office is located in the District of Columbia, and it does

business in the District of Columbia.

## **INTRODUCTION**

4.      This lawsuit involves allegations by Atousa Vali that WMATA violated the Employees of District Contractors and Instrumentality Whistleblower Protection Act (the "Act" or "EDCIWPA"), D.C. Code § 2-223.01, et seq., as amended, by engaging in retaliation against Dr. Vali by taking adverse actions against her and terminating her employment as a result of her protesting the violation of safety laws and regulations by the premature opening of the Alexandria, Virginia Railyard prior to passing safety protocols, thereby endangering the safety of WMATA employees and passengers. She was also retaliated against for reporting WMATA's violations to outside safety overlay organizations (Washington Metrorail Safety Commission ("WSMC") and WMATA's Office of Inspector General)

5.      During all times relevant to this lawsuit, Plaintiff Atousa Vali resides at 10824 Antigua Terrace, North Bethesda, Maryland 20852.

6.      Ms. Vali was an employee of WMATA, within the meaning of D.C. Code § 2-223.01(3).

7.      Defendant is an "Instrumentality" of the District of Columbia Government with the meaning D.C. Code § 2-233.01(5), with its principal place of business in the District of Columbia located at 300 7th Street, S.W., Washington, D.C. 20024.

## **STATEMENT OF FACTS**

8.      Atousa Vali, Ph.D. was hired by WMATA in June 2018.  She has a Ph.D. in Electrical and Computer Engineering, PMP, P. Eng (Professional Engineer by PEO in Canada).

9.      Dr. Vali also has over 27 years of experience in the advanced control and high-speed telecommunication field. Almost 17 years of those years have been dedicated to the Train

Control and Automation field (CBTC, ATC) and Positive Training Control (PTC, IETMS, ITCS). That experience included almost five years working as a Senior Engineering Director at Amtrak in C&S (Communications and Signal) Department, working as Executive Engineering Director at Alstom Transport, over five years as Lead Engineering Manager at Bombardier Transportation, and approximately six years as Principal Engineer, researcher and Consultant at High Speed Networks (SITE).

10.    She is well-known in the rail industry and served the Association of American Railroads ("AAR") as a Chair of ACSES for four years, and the Institute of Electrical and Electronics Engineers ("IEEE") as a Paper-review Judge and represented WMATA at the Eastern Signal Engineers ("ESE").

11.    Dr. Vali served as WMATA's Department Chief of its Automatic Train Control ("ATC") Engineering Department until she was abruptly terminated on July 9, 2021.

12.    The ATC system is a vital system (a fail-safe control system with restricted rules and regulations basically governed by the Federal Railroad Administration's ("FRA") and the American Railway Engineering and Maintenance-of-Way Association ("AREMA") guidelines and the IEEE processes). The ATC is responsible for safe train movement, including train speed control, safe stop and door open, preventive train-to-train collisions, over-speed derailments, and unauthorized train movement for railroad worker and passenger protection. The ATC ensures the safety of WMATA's passengers by acting as a safeguard against human errors and other potential hazards.

13.    On May 22 and 23, 2021, Dr. Vali was ordered by her supervisor, Nichalos Gardner, to sign off on WMATA's "C99" Alexandria Yard "Zone D" Temporary Use Notice ("TUN").

She declined to do so because several required engineering specifications affecting safety and reliability of the system remained incomplete.

14. Specifically, the missing specifications include ATC Specification 34 42 19 - RAMS ("Reliability, Availability, Maintainability and Safety") and ATC Specification 34 42 24 ("Vital Processors and Networking"). These specifications require safety and software design and development documents, including but not limited to Preliminary Hazard Analysis ("PHA"), safety assessment, FMCA, Microcontrollers' Software Design Document ("SDD"), Verification and Validation ("V&V"), Interface Control Documents ("ICD"), and tests that proved that the yard's temporary activation was, and is, complete and safe for operation. All of this documentation was missing from the project at that time (May 2021).

15. Mr. Gardner and his manager, Ms. Laura Mason, repeatedly pushed Dr. Vali and her engineering team to sign off on the TUN, and they all refused because it would be in violation of legal requirements and endanger employee and passenger safety.

16. First, Dr. Vali's senior engineer (Nando) refused to sign off on the incomplete package.

17. Then, Dr. Vali's engineering manager, Johann Glansdorp, declined, and finally Dr. Vali stood her ground over the obvious safety issues, violations of engineering processes and potential hazards.

18. Dr. Vali and her team are well-familiar with the system and were committed to the operation safety. They knew that major requirements were missing from the package. Dr. Vali's field engineer was uncomfortable because of "WTP" (wiring and relay contact checks) testing. They observed major software dysfunctions in switching, design discrepancies of controllers, and they noticed unknown software changes.

19.    The obvious dysfunctions included Diamond Crossing software with time misalignment that could cause train derailments.  Dr. Vali was personally aware that major software requirements missing from the TUN package.

20.    Dr. Vali previously and on an ongoing basis had been requesting these specification and design documents from WMATA's suppliers and the WMATA project team in every progress meeting since 2020. She kept repeating the requirements in her communications with WMATA's "Signaling Systems Renewal Program" ("SSRP") (project) team.

21.    Dr. Vali's last struggle to obtain the required documentation, after serval meetings and constant pressure, was her memo issued on May 22, 2021. By her communication, she clearly indicated what was missing from the TUN package.  These documents are proof of applying proper processes for designing, developing and testing the system and the associated software and hardware that controls the Yard's movements.

22.    Mr. Gardner kept pressing Dr. Vali to sign off on the TUN, but she and her team refused to do so.  Dr. Vali explained that she has consulted her team, and no one in the ATC Engineering Department will sign off on the TUN. She even suggested a retreat with the other stakeholders and affected and participating WMATA departments for sixty days to discuss the outstanding safety issues further.

23.    At one point, Mr. Gardner was on board with the possibility of implementing a retreat, but later he completely excluded the idea.  Dr. Vali and Mr. Gardner had several meetings, and she continued to tell him and his supervisor, Laura Mason, that without "Reliability, Availability, Maintainability and Safety" ("RAMS") documents that *only* the system designer ("McDean") could supply, she and her team would not be able to identify the safety hazards that existed.

24.   Consequently, she and her team needed to default to a worst-case scenario, which could be train derailment, fire, operator injury or fatality.

25.   Mr. Gardner had Dr. Vali on the phone for hours trivializing the issues and accusing her of "not being collaborative."  Mr. Gardner is a civil engineer.  He has no expertise in train movements, electrical and computer engineering, unlike Dr. Vali.

26.   Dr. Vali and her team continued to present Mr. Gardner with documents, emails and memos to justify their position that railroad safety regulations and the safety of employees and passengers were at stake.  They repeated advised Mr. Gardner that "safety trumps service," but he, Ms. Mason, Mr. Andy Off and the project team were determined to open the Alexandra Yard.

27.   Dr. Vali reminded Mr. Gardner that she had seen two Amtrak accidents caused by negligence (in the absence of positive train control ("PTC")).  As a result, as ATC Department Chief, she could not sign off on the TUN without proper required RAMS and software documents.

28.   Despite her pleadings, Mr. Gardner did not wish to understand or acknowledge the importance of these safety requirements.  He appeared to be singularly focused on getting Zone D of the Alexandria Yard open and operating, despite Dr. Vali's concerns about open safety issues.

29.   On May 23, 2021, Mr. Gardner asked that the signature line, which was originally assigned to Dr. Vali's manager, to be changed to his name.  Mr. Gardner then digitally signed off on the TUN on behalf of Dr. Vali's department (ATC Engineering). This was shocking to Dr. Vali and her team, despite all of the safety concerns and warnings they presented to Mr. Gardner, Ms. Mason, Mr. Oft and others.

30.  Mr. Gardner has no ATC background or qualifications, but this Alexandria Railyard project was mostly an ATC engineering rehabilitation project.

31.  As a result of Mr. Gardner's actions, Dr. Vali decided to bring her safety concerns to the attention of the Washington Metrorail Safety Commission ("WSMC") and WMATA's Office of Inspector General ("OIG") and asked them for an investigation.

32.  On May 28, 2021 and also during that weekend, she informed the OIG's agent about her safety concerns. The OIG's representative mentioned that he would schedule a meeting with the OIG's Deputy and Senior Director soon. He scheduled a meeting for June 9, 2021.

33.  On June 1, Mr. Gardner sent Dr. Vali a meeting invitation to discuss "ATC projects close out." He used this meeting to tell Dr. Vali: "The C99's operation is safe." "We have to celebrate our victory!"

34.  Mr. Gardner admonished Dr. Vali and told her, "You need to be more collaborative."  Mr. Gardner repeatedly characterized her prior safety concerns as "quality issues not safety issues." Dr. Vali continued to correct him and told him that the engineering requirements are missing, and without a Preliminary Hazard Analysis ("PHA") and "Failure Mode, Effects & Criticality Analysis" ("FMECA"), WMATA was blind to the design and potential risks and prone to an accident. Therefore, the ATC Engineering Department did not know what could go wrong and how to mitigate it.

35.  Dr. Vali further explained to Mr. Gardner that derailment is a "Safety Level 1" (red) violation in any Preliminary Hazard Analysis ("PHA").  She concluded that, even after all discussions and meetings, the safety hazard identified for C99 was incomplete and did not consider or address, through documentation or otherwise, a derailment on the third rail, fire, or operator safety.

36. Dr. Vali repeated that she stood firm regarding the need for safety first, and she was obligated to do a follow up.  Dr. Vali also asked Mr. Gardner to help her understand what the rush was to open the Yard prematurely.   Mr. Gardner was infuriated and left the meeting abruptly.

37. On June 2 at 7:50 a.m., Dr. Vali received a "reprimand letter" from Gardner, containing personal attacks and false accusations. She responded the next day in a very professional manner.

38. Upon receiving her response, Mr. Gardner became very hostile towards her and began harassing her by calling her frequently, giving her conflicting directions and criticizing her for every decision she was making. For instance, he asked her to issue a memo, and then he rebuked her for issuing the memo.  He characterized her memos as "pitiful" and "unfair."  Mr. Gardner's unprofessional behavior was witnessed by Dr. Vali's team members. Dr. Vali reported the abuse of power, harassment and apparent corruption to the WSMC's agent.

39. On June 2, Dr. Vali's engineering manager (Mr. Glansdorp) informed her that the WSMC mandated that WMATA release any TUN (including C99's TUN) to them. However, when Johann Glansdorp questioned WMATA's Safety Department, he was told that WSMC's "overseeing program" had started on June 1 2021, and the TUN was issued before that time.  Dr. Vali and her team learned (from the WSMC) later that the Safety Department's understanding of the timing of the TUN's issuance was incorrect.

40. On June 5, one of Dr. Vali's managers (Myron Fitch) reported to her that there were some compliance issues that could have negative impacts on the safety of the Alexandria yard project because engineering and safety were bypassed.  This news confirmed Dr. Vali's

safety concerns and her department's exclusion from the final process before the TUN was executed by Mr. Gardner and others in management.

41.     On June 9, in an abundance of caution and to ensure the C99 safety, Dr. Vali asked Mr. Glansdorp to issue another memo requesting safety, design, and test documents.  She was afraid of Mr. Gardner's reaction but felt obligated to do the right thing under the circumstances.  Regrettably, her fears were realized.  Mr. Gardner called her in rage after the memo was issued by her department.

42.     On June 9, Mr. Glansdorp and Dr. Vali attended a meeting with WMATA's Deputy OIG and Director to discuss the details of C99 and their safety concerns.  Dr. Vali shared with them that Mr. Gardner had been dismissing their concerns without any ATC knowledge and background.   He became hostile and mistreated Dr. Vali after the C99 TUN was issued.

43.     Dr. Vali shared with the OIG that, in Amtrak's accident, nine people were killed.  She would not tolerate any safety risks. She explained that ATC Engineering requirements and RAMS requirements were not fully satisfied to assure her, as Department Chief, that the yard was safe to be opened.

44.     Separately, the WSMC contacted Dr. Vali around the same time about the TUN and questioned her more about it and why WMATA's ATC Engineering Department did not sign off on it.  Dr. Vali sent the WSMC the documents similar to the ones that she sent to WMATA's OIG.

45.     On June 16, 2021, at Dr. Vali's direction, Mr. Myron Fitch (the Compliance Manager in Dr. Vali's Department) issued a memo to "QICO" (WMATA's "Quality and Compliance" group) raising their concerns about bypassing the ATC Engineering Department.  The

memo reported that ATC Engineering was bypassed in three ways: (1) the technical submittals were not assigned to the ATC Engineering Department for review and approval; (2) the submittals that were visible to the ATC Engineering Department as "under review" (marked revise and resubmit) were approved and closed out by WMATA's SSRP project team; and (3) the ATC Engineering Department's requirements were dropped without any consultation with the Department staff.

46.     Dr. Vali also brought these issues to Mr. Gardner's attention and emphasized the potential safety hazards.  To her dismay, he asked for a meeting only and did not immediately react to or address her concerns. During the meeting, an SSRP project team representative responded that "We did this to push the project out."

47.     The Alexandria yard project was supposed to be delivered by *2023*.  However, the SSRP project team decided to expedite approval to 2021 without full consultation or support by Dr. Vali and her ATC Engineering Department, violating engineering processes and bypassing design and safety requirements and protocols.

### Dr. Vali Also Raises Concerns About The Auto Door Safety Issue

48.     On June 10, 2021, Dr. Vali discovered that the "auto door open" function on the Red Line train system was potentially unsafe. The auto door activation was another project ran by the WMATA's newly created SSRP group. She and WMATA's QICO Group requested the auto door feature be stopped until the issue could be addressed and remedied. Mike Hass of the QICO Group helped her with stopping it.  Mr. Gardner was not in the meeting, and they needed to take immediate action to correct the issue.

49.     Later that day, when Dr. Vali informed Mr. Gardner of the actions that she took to address the immediate safety issue, he berated her, stating "You are totally losing it", "Why? Why?

Why?"  He was unable to understand the complications of the auto door function and the criticality of that issue. He was not listening to understand the situation either.  He was adversarial and pushed back on anything Dr. Vali was saying or doing.

50.     On June 16, after further investigation, Dr. Vali released a memo to Mr. Gardner with four attachments, including a QICO and Automatic Train Control Maintenance ("ATCM") Group report, that proved that WMATA knew about the unacceptable datasheets and test results for the auto door function since *2019*, but no corrective actions were taken by the ATCM Group to address the issue.  The auto door remained activated.  Dr. Vali explained in the memo that this is a serious safety hazard and doors may automatically open outside of the station platform.

51.     On July 1, to her surprise, Mr. Gardner censored her memo by eliminating and/or redacting the background, internal compliance reports and ATCM data records in order to wipe out the history and unsafe door activation. He called Dr. Vali in a threatening voice: "You don't get it."  "You are totally losing it."  Again, he repeated: "These are quality issues not safety issues."

52.     After being harassed repeatedly by Mr. Gardner to the point of feeling ill, Dr. Vali reluctantly acquiesced to Mr. Gardner and issued the censored memo. She told her managers about Mr. Gardner's unprofessional treatment of her.

53.     On July 8, Dr. Vali's compliance manager (Myron Fitch) released more detailed information to the OIG in response to their inquiries.

54.     On July 9, Dr. Vali communicated with Mr. Gardner's supervisor, Andy Off, expressing her concerns with the safety of ongoing projects.  She escalated concerns about other ATC projects as well and requested a meeting. She copied her managers to let them know that

she was seeking assistance from Mr. Gardner's boss and looking forward to a discussion on the safety and integrity of the ATC projects and system.  She had enough and had planned to let Mr. Off know that Mr. Gardner was impeding her ability to do her job, was harassing her, censoring her memos and, worst of all, dismissing her safety concerns, even though she was a longstanding expert in these issues, and Mr. Gardner was not.  She planned to ask for help to correct the abuse.

55.    A short time after she sent the email to Mr. Off, Mr. Gardner sent Dr. Vali an invitation at 9:39 a.m. to meet at 3:30 p.m. entitled "Performance Documents."  Dr. Vali responded that she worked from 7:00 a.m. and had a hard stop at 2:30 p.m.   He replied, "No."

56.    Dr. Vali managed to arrive at the 3:30 p.m. meeting as directed, and Mr. Gardner terminated her employment in the presence of a Human Resources agent (Branda).  Dr. Vali asked, "Is this a retaliation for the C99 yard?" He did not answer.  No reason was given for her abrupt termination.

57.    In response to Dr. Vali protests, WMATA responded by defaming her character to justify their retaliatory acts.

58.    All conditions precedent for the filing of this lawsuit have been satisfied.

**COUNT I**
**VIOLATION OF D.C. CODE §§ 2-233.01 ET SEQ., FOR WHISTLEBLOWER RETAIATION**

59.    Plaintiff realleges and incorporates by reference all prior paragraphs as if fully set forth herein.

60.    Defendant is a named "Instrumentality" covered by the Employees of District Contractors and Instrumentality Whistleblower Protection Act.  D.C. Code § 2-233.01(5).

61.    A "'Prohibited personnel action' includes but is not limited to: recommended, threatened,

or actual termination, demotion, suspension, or reprimand; … or in any other manner retaliating against an employee because that employee has made a protected disclosure or refuses to comply with an illegal order, as those terms are defined in this section."  D.C. Code § 2-233.01(6).

62.     An "'Illegal order' means a directive to violate or to assist in violating a federal, state, or local law, rule, or regulation."  *Id*. at 2-233.01(4).

63.     The Act defines a "Protected disclosure" as:

> … [A]ny disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or to a public body that the employee reasonably believes evidences:
>
> **(A)**  Gross mismanagement in connection with the administration of a public program or the execution of a public contract;
> **(B)**  Gross misuse or waste of public resources or funds;
> **(C)**  Abuse of authority in connection with the administration of a public program or the execution of a public contract;
> **(D)**  A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or
> **(E)**  A substantial and specific danger to the public health and safety.

D.C. Code § 2-233.01(7).

64.     The Act provides that "A supervisor shall not threaten to take or take a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure or because of an employee's refusal to comply with an illegal order."  D.C. Code § 2-233.02(a).

65.     The Act further provides that "[a]n employee aggrieved by a violation of § 2-223.02 may bring a civil action before a court or a jury … seeking relief and damages, including but not limited to injunction, reinstatement to the same position held before the prohibited

personnel action or to an equivalent position, and reinstatement of the employee's seniority rights, restoration of lost benefits, back pay and interest on back pay, compensatory damages, reasonable costs, and attorney fees." D.C. Code § 2-233.03(a).

66. "As part of the relief ordered in an administrative, arbitral or judicial proceeding, a supervisor employed by a District instrumentality who is found to have violated § 2-223.02 shall be subject to appropriate disciplinary action, up to and including dismissal," as well as pay a civil fine. D.C. Code § 2-233.04.

67. WMATA is not immune from suit under the Act because both Maryland and Virginia protect WMATA whistleblowers by statute and have thereby waived sovereign immunity. D.C. Code § 2-233.07(b); MD State Personnel and Pensions Code § 5-301, et seq.; VA Fraud and Abuse Whistleblower Protection Act, VA Code 2.2-3009, et seq.

68. Dr. Vali made protected disclosures and refused to comply with illegal orders issued by Mr. Gardner and other WMATA managers pertaining to the Alexandria Railyard TUN and auto door function issue, respectively. Thus, Dr Vali is a protected "whistleblower" within the meaning of the Act. D.C. Code § 2-233.01(10).

69. As a result of her protected disclosures and/or refusals to comply with illegal orders, WMATA, through its managers, took prohibited personnel actions against Dr. Vali, including but not limited to issuing adverse warnings and reprimands and ultimately terminating her employment.

70. Dr. Vali's protected disclosures and/or refusals to follow illegal orders were "a contributing factor in the alleged prohibited personnel action[s] against [her]. D.C. Code § 2-233.03(b).

71. WMATA is unable to "prove by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if [Dr. Vali] had not engaged

in activities protected by [the Act]." *Id*.

72.     As a result of Defendant's whistleblower retaliation against Dr. Vali, she has and will suffer economic damages and has suffered compensatory damages for pain, suffering, physical symptoms, emotional anguish and damage to her reputation, justifying an award of monetary damages to be proven at trial.

73.     Plaintiff also seeks reimbursement of attorneys' fees and costs, pre-judgment interest and other remedies associated with pursuing this matter.

## JURY TRIAL DEMAND

74.     Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

75.     **WHEREFORE** Plaintiff prays for the Court and/or Jury to:

   a.   Find that Defendant WMATA retaliated against Plaintiff for making protected disclosures and/or refusing to follow illegal orders by, among other actions and inactions, issuing improper disciplinary warnings and reprimands and terminating her employment in violation of the Act;

   b.   Order injunctive relief, including but not limited to annual training for all managers of Defendant; proper posting of notices that set forth the requirements of the Act in conformity with D.C. Code § 2-233.06;

   c.   Award to Plaintiff and against Defendant reinstatement to the same position held before the prohibited personnel actions or to an equivalent position, reinstatement of her seniority rights, restoration of lost benefits, back pay and interest on back pay, and compensatory damages for the emotional harm, frustration, indignities, and anxiety suffered, in an amount to be proven at trial;

15

    d.   Award to Plaintiff and against Defendant reimbursement of reasonable attorneys'

          fees and costs associated with pursuing this matter;

    e.   Award to Plaintiff and against Defendant interest on such judgment; and

    f.   Award such other relief as the Court deems proper.

Dated: June 3, 2022          Respectfully submitted,

                           KALBIAN HAGERTY, LLP

                           By__/s/__Eric L. Siegel
                           Eric L. Siegel  (Bar No. 427350)
                           William P. McGrath, Jr (Bar No. 422160)
                           888 17th Street, N.W., Suite 1200
                           Washington, D.C. 20006
                           (202) 419-3296
                           esiegel@kalbianhagerty.com

                           *Attorneys for Plaintiff Atousa Vali*