UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**ATOUSA VALI SICHANI**,

    Plaintiff,

    v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**,

    Defendant.

Case No. 22-cv-1584 (CRC)

**MEMORANDUM OPINION**

Plaintiff Atousa Vali[1] sued her former employer, Washington Metropolitan Area Transit Authority ("WMATA"), following her termination in the summer of 2021. After her original complaint was dismissed and her motion to file an amended complaint denied without prejudice, Dr. Vali moved to amend her complaint a second time. She now alleges, under District of Columbia law, that WMATA wrongfully terminated her in violation of public policy. WMATA opposes her proposed new complaint on the grounds that sovereign immunity shields it from suit and the complaint fails to state a claim. Finding that WMATA has waived its immunity with respect to the alleged conduct but that the amended complaint fails to allege a violation of D.C. law, the Court will deny Vali's motion to amend with prejudice and dismiss the case.

**I.     Background**

The Court draws the following background from Dr. Vali's proposed Second Amended Complaint. WMATA no doubt contests some of the alleged facts.

---

[1] Although Plaintiff's name in the complaint caption is Atousa Vali Sichani, both sides have referred to her as Dr. Atousa Vali. The Court follows suit.

Vali headed WMATA's Automatic Train Control ("ATC") engineering department until her termination in July 2021. Second Am. Compl. ("SAC") ¶ 13 [ECF 17-2].[2] Vali claims that in late May 2021 her supervisor, Nicholas Gardner, repeatedly asked her to certify that the ATC system at WMATA's Alexandria, Virginia railyard was operational. Id. ¶ 45. Specifically, Gardner allegedly asked her to execute a Temporary Use Notice ("TUN")—a document that signified that all required documentation had been received and the railyard was safe for operation. Id. ¶¶ 45–46. Vali alleges that she, along with members of her department, refused to execute the TUN because they were missing certain documentation, including "specification, design, and test documents from WMATA's suppliers" and "project team." Id. ¶¶ 51, 53–55. Vali and her team also identified purported safety concerns with the railyard, including a software program that was missing features designed to prevent train derailment. Id. ¶ 53.

In meetings, phone calls, and a memorandum she issued on May 22, Vali continued to refuse to sign the TUN. Id. ¶¶ 47, 54–55, 58, 61. On May 23, however, Gardner changed the TUN's signature line from Vali's name to his own and executed the TUN himself. Id. ¶ 65. Later that week, Vali contacted WMATA's Office of Inspector General ("OIG") and the Washington Metrorail Safety Commission ("WMSC"), the agency with direct safety oversight of WMATA, to raise her "safety concerns" about Gardner's certification of the TUN. Id. ¶¶ 18, 65, 67.[3]

In June, Vali also discovered that an "auto[matic] door open" function on the Red Line Metrorail was potentially unsafe and could lead to doors opening between stations. Id. ¶¶ 87, 89. Vali prepared a memorandum for Gardner, which included information indicating that WMATA

---

[2] Automatic Train Control ("ATC") refers to a system of railway safety features, including mechanisms that limit train speed, prevent collisions, and control door operation. SAC ¶ 14.

[3] Under federal law, states are required to create oversight agencies for public rail systems. 49 U.S.C. § 5329(e)(3)(C). WMSC serves as the state safety oversight agency for WMATA. See WMSC Program Standard Rev. 4.1 § 1.A, at 5 (June 28, 2021).

had been aware of the door hazard since 2019.  Id. ¶ 89.  Gardner, however, allegedly edited the memorandum to omit some of this information and directed Vali to submit the "censored" memorandum to WMSC.  Id. ¶¶ 91, 93.  WMATA's Chief Safety Officer later contacted Vali to discuss the automatic door issue.  Id. ¶ 95.

The following month, Vali contacted Gardner's supervisor to discuss her concerns about the safety of ongoing projects.  Id. ¶¶ 98–99.  Soon after her outreach, Gardner scheduled a meeting to discuss Vali's job performance and fired her.  Id. ¶¶ 101–02.  At the meeting, Vali asked Gardner whether he was firing her in "retaliation for the [Alexandria] railyard," but he allegedly gave "[n]o reason" for her termination.  Id. ¶ 101.  This suit followed.

After the Court granted WMATA's motion to dismiss Vali's original complaint and denied without prejudice her first motion to amend the complaint, Op. [ECF 15], Vali filed a second motion to amend, Mot. Leave to File Second Am. Compl. [ECF 17-1].  Her new one-count complaint alleges that WMATA wrongfully terminated her in violation of public policy.  SAC ¶¶ 105–123.  Specifically, she alleges that "[t]he sole or predominant reason" for her termination "was her protected disclosures to WMATA managers, the WMSC[,] and WMATA's OIG regarding WMATA's violations of law, rule or regulations[,] and or its abuse of authority."  Id. ¶ 116.

II.  Legal Standards

   A.  Amending a Complaint

Federal Rule of Civil Procedure 15(a)(2) allows a plaintiff to file an amended complaint more than twenty-one days after an answer has been served only with the opposing party's consent or with leave of court.  Fed. R. Civ. P. 15(a)(2).  Leave to amend is to be "freely given when justice so requires" but may be denied due to "futility of amendment."  Foman v. Davis, 371 U.S. 178, 182 (1962) (quoting Fed. R. Civ. P. 15(a)).  The defendant bears the burden of showing that leave to

amend should be denied. See, e.g., Howard v. George Washington Univ., No. 22-cv-02902 (JMC), 2023 WL 3231447, at *2 (D.D.C. May 3, 2023) (cleaned up).

Because an amended complaint is futile if it would not survive a motion to dismiss, courts assess proposed amendments under the standards of Federal Rule of Civil Procedure 12(b). Moldea v. N.Y. Times Co., 22 F.3d 310, 319 (D.C. Cir. 1994). WMATA asserts two Rule 12(b) grounds for why the amendment is futile. First, under Rule 12(b)(1), WMATA contends that its sovereign immunity deprives this Court of subject matter jurisdiction. Opp'n at 4 [ECF 18]. Second, under Rule 12(b)(6), WMATA asserts that the second amended complaint fails to state a claim. Id.

B. Lack of Subject Matter Jurisdiction

As "[f]ederal courts are courts of limited jurisdiction," Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994), a court must ensure it has subject matter jurisdiction over a claim before proceeding to the merits, Moms Against Mercury v. FDA, 483 F.3d 824, 826 (D.C. Cir. 2007). The Court lacks subject matter jurisdiction over any claim barred by sovereign immunity. See Burkhart v. WMATA, 112 F.3d 1207, 1216 (D.C. Cir. 1997). On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing jurisdiction. Knapp Med. Ctr. v. Hargan, 875 F.3d 1125, 1128 (D.C. Cir. 2017). The Court must "accept all well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," but need not "assume the truth of legal conclusions" in the complaint. Williams v. Lew, 819 F.3d 466, 472 (D.C. Cir. 2016) (cleaned up). The Court also "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

C. Failure to State a Claim

Under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The court "assumes the truth of all well-pleaded factual allegations in the complaint and construes reasonable inferences from those allegations in the plaintiff's favor but is not required to accept the plaintiff's legal conclusions as correct." Sissel v. U.S. Dep't of Health & Hum. Servs., 760 F.3d 1, 4 (D.C. Cir. 2014) (cleaned up).

### III. Analysis

At the outset, the Court must decide whether it is obligated to address WMATA's claim of sovereign immunity before it considers its 12(b)(6) argument. Ordinarily, federal courts are required to address jurisdictional questions before ruling on the merits of parties' claims. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93–94 (1998). But, as the D.C. Circuit has acknowledged, "there is considerable uncertainty about sequencing in the Eleventh Amendment context." Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev., 639 F.3d 1078, 1084 (D.C. Cir. 2011).

The Supreme Court has recognized factors that permit consideration of certain non-jurisdictional issues before state sovereign immunity. But those factors are absent here. In Vermont Agency of Natural Resource v. United States ex rel. Stevens, the Supreme Court decided whether the False Claims Act ("FCA") provided for suits against states *before* determining whether the Eleventh Amendment permitted such a suit. 529 U.S. 765, 778 (2000). In that case, however, "logical priority and [the] virtual coincidence of scope" between the two inquiries—namely, whether states could be sued under the FCA (the statutory question) and whether unconsenting states could be sued under the FCA (the sovereign immunity question)—made "it possible, and indeed, appropriate, to decide the statutory issue first." Id. at 779–80. The same logical priority and coincidence of scope do not exist here, so the Court will decide the sovereign immunity issue

before the merits. See also Mowrer v. United States Dep't of Transp., 14 F.4th 723, 735 (D.C. Cir. 2021) (Katsas, J., concurring) ("[B]ecause state sovereign immunity imposes a 'jurisdictional restriction' on the federal courts, it must be 'given priority' under Steel Co." (quoting Vt. Agency of Nat. Res., 529 U.S. at 778–80)).

    A.  Sovereign Immunity

WMATA was created via a compact signed by Maryland, Virginia, and the District of Columbia and consented to by Congress. Pub. L. No.89–774, 80 Stat. 1324 (1966) (codified as amended at D.C. CODE § 9-1107.01). In signing the compact, the states and the District "conferred upon WMATA their respective sovereign immunities." Beebe v. WMATA, 129 F.3d 1283, 1287 (D.C. Cir. 1997). Section 80 of the compact waives WMATA's immunity for torts "committed in the conduct of any proprietary function" but retains immunity for torts committed "in the performance of a governmental function." D.C. CODE § 9-1107.01(80). To distinguish between governmental and proprietary functions, the D.C. Circuit looks to whether a function is "discretionary, and thus shielded by sovereign immunity." Beebe, 129 F.3d at 1287.

The D.C. Circuit uses a two-step test to determine whether a function is discretionary. First, if a "statute, regulation, or policy specifically prescribes a course of action for an employee to follow," the action is non-discretionary and falls within Section 80's waiver of immunity. Id. (cleaned up). Similarly, conduct is non-discretionary when a law proscribes a course of action an employee may not follow. See Banneker Ventures, LLC v. Graham, 798 F.3d 1119, 1143 (D.C. Cir. 2015) ("We see no difference between a *prescription* by policy that leaves no room for choice and a *proscription* that does the same."). When no course of action is mandated, we proceed to step two. If the "exercise of discretion is grounded in social, economic, or political goals," the action is governmental and therefore shielded from suit by WMATA's sovereign immunity. Id. (cleaned up).

Under the first step of this test, Gardner did not have discretion to terminate Vali under the circumstances alleged in the Second Amended Complaint, which the Court must accept as true. Federal law, as well as WMATA's internal policy, prohibited WMATA from terminating Vali in retaliation for the whistleblowing activities she recounts. The National Transit Safety System Act ("NTSSA") provides that WMATA "shall not discharge" an employee for "providing information" to a supervisor regarding conduct the employee "reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to public transportation safety or security." 6 U.S.C. § 1142(a)(1); see also WMSC Program Standard Rev. 4.0 § 1(D)(2) (June 1, 2021) ("WMATA may not retaliate against any official, employee, consultant, or contractor who interacts with [] WMSC.").[4] And WMATA's internal policy "prohibits retaliation against" an employee who engages in a protected activity, including "making a disclosure of information that [the] [e]mployee reasonably believes is evidence" of a "violation of law." Def.'s Opp. to First Motion to Amend, Ex. 1 ¶¶ 1.02, 3.06 [ECF 12-2]; see also Workagegnehu v. WMATA, 373 F. Supp. 3d 110, 118 (D.D.C. 2019), aff'd, 980 F.3d 874 (D.C. Cir. 2020) ("[C]ourts in this district and the D.C. Court of Appeals have consistently held that internal WMATA policies satisfy the first step of [WMATA's sovereign immunity] analysis."). Because these laws and WMATA's own policy prohibited WMATA from terminating Vali for the instances of whistleblowing alleged in the complaint, her termination was, by definition, non-discretionary. See Red Lake Band of Chippewa Indians v. United States, 800

---

[4] Under federal regulation, state safety oversight agencies are required to issue program standards that set "polic[ies] and objectives" for rail safety. 49 C.F.R §§ 674.27(a)(3). WMSC has issued several revisions to its program standards since its inception in 2019. See WMSC, PROGRAM STANDARD, https://wmsc.gov/program-standard/ (last visited Nov. 1, 2023); SAC ¶ 18. The June 1, 2021 version of the WMSC Program Standard—the version Vali cites—is not available on WMSC's website, and neither party has provided a copy to the Court. In light of its obligation to "assume[] the truth of all well-pleaded factual allegations in the complaint[,]" however, the Court will trust that Vali has accurately described the contents of the June 1, 2021 version. Sissel, 760 F.3d at 4 (cleaned up).

F.2d 1187, 1196 (D.C. Cir. 1986) ("A government official has no discretion to violate the binding laws, regulations, or policies that define the extent of his official powers.").[5]

Despite these prohibitions on retaliatory firing, WMATA asserts that it is entitled to sovereign immunity because "an unbroken line of precedent" in this Circuit has held that "personnel actions involving WMATA employees are discretionary in nature and thus immune from judicial review." Opp'n at 7. Not quite. While courts have not, to date, found a WMATA employment action to be non-discretionary, the D.C. Circuit left open the door to that possibility. See Beebe, 129 F.3d at 1288 ("[N]ot every action connected in some way to an employment decision amounts to a discretionary function."). And WMATA walked through that door when, on Vali's telling, it fired her in violation of the law.

Several factors distinguish Vali's termination from the cases WMATA cites. First, in many of those cases, WMATA proffered a clear, non-retaliatory reason to fire or demote the employee. In Williams v. WMATA, for example, WMATA terminated an employee after she "failed to meet the . . . requirements" of her performance improvement plan. No. 17-cv-890 (APM), 2019 WL 2058723, at *3 (D.D.C. May 9, 2019); see also Taylor v. WMATA, 109 F. Supp. 2d 11, 12 n.2 (D.D.C. 2000) (WMATA demoted an employee for issuing "a string of invectives directed toward [a] [m]anager, specifically regarding his ethnic origin"); Battles v. WMATA, 272 F. Supp. 3d 5, 15

---

[5] Vali also claims that the D.C. Whistleblower Protection Act ("DCWPA") and the Occupational Safety and Health ("OSH") Act's anti-retaliation provision prohibited Gardner from terminating her. See SAC ¶¶ 40–43. Neither law applies. The DCWPA (codified at D.C. CODE § 1-615.51 et seq.) is different from the D.C. Employees of District Contractors and Instrumentality Whistleblower Act (codified at D.C. CODE § 2-223.01 et seq.) and applies to employees of the District—not to employees of instrumentalities, like Vali. See D.C. CODE § 1-615.52(3) ("'Employee' means any person who is a former or current District employee."). The OSH Act provides that "[n]o person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint[,] instituted or caused to be instituted any proceeding under or related to this chapter or . . . testified or is about to testify in any such proceeding." 29 U.S.C. § 660(c)(1). Vali, however, does not allege she filed a complaint, instituted a proceeding under the OSH Act, or testified in such a proceeding.

(D.D.C. 2017) (WMATA terminated an employee after an internal investigation concluded he had "violated work policies related to favoritism," and the employee did "not point[] to any 'statute, regulation, or policy' that prescribe[d] WMATA's decision"); Malloy v. WMATA, 187 F. Supp. 3d 34, 38–39 (D.D.C. 2016) (WMATA suspended a train operator after two safety incidents and then fired him after he failed to comply with instructions from a medical examiner).  Because WMATA presented legitimate, non-retaliatory reasons to fire or demote these employees, these decisions all "involved a large measure of choice"—a hallmark of a discretionary decision.  Beebe, 129 F.3d at 1288; see also United States v. Gaubert, 499 U.S. 315, 325 (1991) ("A discretionary act is one that involves choice or judgment.").  By contrast, WMATA offers no non-retaliatory basis for Vali's firing.[6]

Second, in another set of cases, the plaintiffs failed to point to any laws or policies that cabined WMATA's discretion.  See Headen v. WMATA, 741 F. Supp. 2d 289, 292, 296 (D.D.C. 2010) (*pro se* plaintiff did not argue that WMATA's discretion to terminate her was limited by any law or policy and WMATA's dismissal letter to the plaintiff listed a "series of incidents" she was involved in); Pl.'s Memorandum of Points & Auths. in Support of Pl.'s Opp'n to Defs.' Mot. Dismiss at 1, Moskowitz v. WMATA, No. 20-cv-1429 (ABJ), 2021 WL 6841843 (D.D.C. Mar. 10, 2021) (plaintiff conceded that she had "improperly" pled the allegations addressing WMATA's waiver of sovereign immunity).  Vali, however, has pointed to several laws and policies that prohibited her termination on solely retaliatory grounds.

---

[6]  In its motion to dismiss, WMATA asserts that Vali was "terminated for poor personal skills and unprofessional behavior."  Mot. Dismiss at 5 [ECF 4].  But WMATA has not cited any *evidence* supporting that assertion.  See also Jerome Stevens Pharms., Inc., 402 F.3d at 1253 ("[A] district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction.").

As a final note, it may seem incongruous that WMATA's conduct can be assessed against particular laws via D.C.'s public-policy exception to at-will employment when the agency is not subject to direct suit under those laws. But two points are important to note. First, this conclusion does not alter WMATA's existing legal responsibilities. Even though WMATA's sovereign immunity shields it from suit under statutes like the NTSSA, see, e.g., Buck v. WMATA, 427 F. Supp. 3d 60, 74 (D.D.C. 2019), WMATA is still bound by the laws' provisions, including, in the NTSSA's case, a restriction on retaliatory firing. WMATA cannot violate the NTSSA just because it maintains immunity with respect to NTSSA-based suits.[7] Second, whatever inconsistency is present can be credited to the scope of Section 80's waiver. D.C., Maryland, and Virginia, with Congress's approval, chose to waive WMATA's immunity for torts "committed in the conduct of any proprietary function" and "in accordance with the law of the applicable signatory." D.C. CODE § 9-1107.01(80). The signatories thus made WMATA vulnerable to suit under state tort laws, including ones that incorporate federal statutes via public-policy exceptions, even as they closed to door to suits under the same federal statutes.[8]

In sum, the Court concludes, based on the present record, that WMATA waived its sovereign immunity to state-law tort claims concerning Vali's termination. The Court will therefore assert subject matter jurisdiction over Vali's wrongful discharge claim and proceed to assess its merits.

---

[7] Though, as the Court notes below, plaintiffs cannot invoke the public policies of NTSSA under D.C.'s wrongful discharge tort because NTSSA creates its own avenue for relief. See infra Part III.B.

[8] Section 12 of WMATA's Compact "confers broad powers on WMATA" to "provide for the qualification, appointment, [and] removal" of employees, Beebe, 120 F.3d at 1287, "without regard to the laws of any of the signatories," D.C. CODE § 9-1107.01(12)(g). The D.C. Circuit has not, however, read Section 12 to preclude WMATA from employment-related suits under Section 80. See Beebe, 129 F.3d at 1287 (acknowledging Section 12 and separately assessing whether WMATA had waived its sovereign immunity under Section 80).

B.  <u>Wrongful Discharge in Violation of Public Policy</u>

The tort of wrongful discharge in violation of public policy carves out a limited exception to the rule that at-will employees in the District of Columbia "may be discharged at any time and for any reason, or for no reason at all."  <u>Liberatore v. Melville Corp.</u>, 168 F.3d 1326, 1329 (D.C. Cir. 1999) (cleaned up).  The public-policy exception—recognized as "very narrow," <u>Carl v. Children's Hosp.</u>, 702 A.2d 159, 162 (D.C. 1997) (Terry, J., concurring)—applies in two situations.  First, a claim succeeds when "the sole reason for the discharge is the employee's refusal to violate the law." <u>Adams v. George W. Cochran & Co.</u>, 597 A.2d 28, 34 (D.C. 1991).  Second, under the so-called <u>Carl</u> rule, a plaintiff may recover if she shows she "was fired after acting in furtherance of a public policy 'solidly based on a statute or regulation that reflects the particular public policy.'"  <u>Leyden v. Am. Accreditation Healthcare Comm'n</u>, 83 F. Supp. 3d 241, 248 (D.D.C. 2015) (quoting <u>Carl</u>, 702 A.2d at 163 (Terry, J., concurring)).

Vali relies on the <u>Carl</u> exception.[9]  Under <u>Carl</u>, a plaintiff must "point to some identifiable policy that has been officially declared in a statute or municipal regulation, or in the Constitution, and [demonstrate] a close fit between the policy and the conduct at issue in the allegedly wrongful termination."  <u>Harris v. D.C. Water & Sewer Auth.</u>, 195 F. Supp. 3d 100, 106 (D.D.C. 2016) (cleaned up).  Since <u>Carl</u>, courts have "painted a somewhat confusing picture" of what kind of public policy is sufficient, but cases with "viable public polic[ies]" have fallen into two categories: where an employee is terminated (1) "for engaging in an activity when the employee points to a law

---

[9] The Court does not understand Vali to be invoking the <u>Adams</u> theory of the public-policy exception, and, in any event, she has failed to do so.  The Second Amended Complaint contends that Vali was "required to report to WMATA management above her level, the WMSC[,] and . . . WMATA's OIG," SAC ¶ 115, but the complaint does not assert that Vali was fired *because she refused to break the law*.  Under <u>Adams</u>, "a cause of action for wrongful discharge would lie only where the employee refuses to violate a specific law and the employer puts to the employee the choice of breaking the law or losing [her] job."  <u>Liberatore</u>, 168 F.3d at 1329.

11

that reflects a policy prohibiting retaliation against an individual for engaging in the type of activity the employee was engaged in" and (2) "for reporting illegal conduct when the employee points to specific laws or regulations that clearly reflect a policy prohibiting the activity about which the employee complained, whether or not the employer actually violated the law or regulation." Perkins v. WCS Constr., LLC, No. 18-cv-751 (RC), 2018 WL 5792828, at *4 (D.D.C. Nov. 5, 2018) (cleaned up).  The Court will head down these two tracks in turn.

First, Vali points to four statutes and policies that, she contends, reflect a policy prohibiting retaliation against whistleblowers: (1) the D.C. Employees of District Contractors and Instrumentality Whistleblower Act (D.C. CODE §§ 2-223.01 et seq.), SAC ¶¶ 41–43, 108–111, 119–120; (2) NTSSA (6 U.S.C. § 1142), id. ¶¶ 37–39, 111; (3) the Occupational Safety and Health ("OSH") Act (29 U.S.C. § 660 et seq.), id. ¶¶ 40, 111; and (4) WMATA's anti-retaliation policy, id. ¶ 121.

None of these statutes or policies provide a basis for relief under Carl.  The D.C. Employees of District Contractors and Instrumentality Whistleblower Act, NTSSA, and the OSH Act contain their own statutory remedies for whistleblowers.  See D.C. CODE § 2-223.03(a) (an aggrieved former employee "may bring a civil action before a court or a jury in the Superior Court of the District of Columbia seeking relief and damages"); 6 U.S.C. § 1142(c)(1) ("[a] person who believes that he or she has been discharged" for whistleblowing may file "a complaint with the Secretary of Labor alleging such discharge"); 29 U.S.C. § 660(c)(2) ("[a]ny employee who believes that he has been discharged" for whistleblowing may "file a complaint with the Secretary").  The public-policy exception is "unavailable 'where the very statute creating the relied-upon public policy already contains a specific and significant remedy for the party aggrieved by its violation.'"  Kassem v. Wash. Hosp. Ctr., 513 F.3d 251, 254 (D.C. Cir. 2008) (quoting Nolting v. Nat'l Cap. Grp., Inc., 621 A.2d 1387, 1390 (D.C. 1993)).

The conclusion does not change even though these statutes are, in practice, unavailable to Vali because WMATA's immunity shields it from suit. The D.C. Court of Appeals crafted the "unavailability rule," (*i.e.*, that plaintiffs may not rely on the public-policy tort when a statute already provides a remedy) in order to give effect to legislatures' intent that certain statutory schemes provide litigants exclusive remedies. See Smith v. Police & Firemen's Ret. & Relief Bd., 460 A.2d 997, 1000 (D.C.1983) ("When a statute provides a comprehensive enforcement scheme for violations of its substantive provisions, a legislative intent to provide an exclusive remedy may be inferred. . . ."). In other words, the unavailability rule exists not to ensure plaintiffs have one, and exactly one, avenue to seek relief but rather to honor the legislative intent behind statutes. See Carter v. District of Columbia, 980 A.2d 1217, 1226 (D.C. 2009) ("[O]ur cases require us to defer to the legislature's prerogatives and to decline to recognize a novel, competing cause of action for wrongful discharge at common law."); Nolting v. Nat'l Cap. Grp., Inc., 621 A.2d 1387, 1388–89 (D.C. 1993) ("[W]e see no basis for any argument that in enacting the provision barring retaliatory discharge, the Council contemplated that any relief would be available for its violation apart from that expressly provided for.").[10]

As for WMATA's anti-retaliation policy, "an employer's violation of mere internal policies cannot support" the public-policy exception. Jones v. D.C. Water & Sewer Auth., 963 F. Supp. 2d 17, 21 (D.D.C. 2013).

---

[10] At the risk of belaboring the point, the Court wishes to address another seeming inconsistency highlighted by its ruling—namely, that NTSSA's prescription on retaliatory firing meant WMATA waived its sovereign immunity with respect to Vali's termination but Vali nonetheless cannot rely on that provision under the D.C. public-policy exception. The answer lies in the limited scope and effect of Section 80's waiver. The WMATA signatories chose to waive the agency's immunity for torts committed in a proprietary function, thus opening the door to certain suits under D.C.'s public-policy exception. But the signatories' choice does not change the operation of D.C. tort law. Put differently, section 80 makes WMATA subject to additional claims, but it does not guarantee those claims will succeed.

Vali also cannot satisfy Carl's second track. Recall that, on this track, an employee must show she was terminated "for reporting illegal conduct when the employee points to [a] specific law[] or regulation[] that clearly reflect[s] a policy prohibiting the activity about which [she] complained." Perkins, 2018 WL 5792828, at *4 (cleaned up). Vali alleges she was terminated for (1) reporting to WMSC and WMATA's OIG that Gardner signed the TUN without receiving the required documentation, see SAC ¶¶ 68, 71, 75, and (2) reporting to WMSC that WMATA issued the TUN without receiving WMSC concurrence, see SAC ¶¶ 76–77. But, at the time Gardner signed the TUN and WMATA issued it, no law or regulation clearly reflected a policy prohibiting either of those actions. Vali makes recourse to many laws and regulations, which the Court will take up in turn.[11]

To start, Vali alleges that Version 4.0 of WMSC's Program Standard required WMATA to "provide all documentation justifying a TUN as required in the Safety and Security Certification Program Plan (SSCPP)" if it planned to use a TUN to "reintroduce a system, asset, or project in passenger service that require[d] WMSC concurrence." SAC ¶ 27 (quoting WMSC Program Standard Rev. 4.0 § 10.A.2 (June 1, 2021)). Version 4.0, however, did not go into effect until June 1, 2021. See SAC ¶ 20. And Gardner allegedly certified the TUN without the required documentation on May 23, 2021. Id. ¶ 65. According to Vali, when she asked WMSC whether the TUN requirement was in effect prior to June 1, WMSC indicated that "advance[] WMSC approval [was required] prior to the Railyard being re-activated." Id. ¶ 77. The Court assumes, as it must,

---

[11] The Second Amended Complaint does not name any law that Gardner violated by directing Vali to issue a "censored memo" to WMSC about the automatic door malfunction. Vali claims that Gardner "ignored the fact" that occurrences of doors opening "required reporting within 24 hours to the WMSC and correcti[ve] action . . . to be taken by WMATA." Id. ¶ 92. But the complaint does not state what law required these steps, nor does it allege that Gardner failed to report an occurrence or blocked corrective action. Indeed, on Vali's telling, WMSC, WMATA's Chief Safety Officer, and "others in WMATA's chain of command" were aware of the automatic door issue. See id. ¶¶ 94, 96.

that Vali has truthfully reported what WMSC told her, but the Court is not required to accept the "legal conclusions [in the complaint] as correct." Sissel, 760 F.3d at 4 (cleaned up). And even if the Court infers that WMSC imposed the advance-approval requirement prior to June 1 through a means other than the Program Standard (*e.g.*, an informal WMSC policy or a verbal communication), Vali has still failed to point to a "law[] or regulation[]" that required WMATA to receive WMSC concurrence before issuing the TUN. Perkins, 2018 WL 5792828, at *4 (cleaned up).

Moreover, as the Court reads it, the version of the WMSC Program Standard in effect in May 2021 did not require WMSC concurrence before issuing a TUN. The Program Standard mandated that WMATA submit "[d]ocumentation regarding" "[a]ny new or rehabilitative work associated with automatic train control" "for WMSC review." WMSC Program Standard at 41 (July 1, 2020). But the Program Standard did not specify *at what stage* WMATA had to submit the documents. In fact, the Program Standard specifically acknowledged that "[t]he review and oversight by [] WMSC will depend significantly on the type of system expansion or modification under review." Id. This language does not "clearly reflect a policy prohibiting" WMATA from certifying a TUN without WMSC concurrence. Perkins, 2018 WL 5792828, at *4. The Court thus cannot conclude that the WMSC Program Standard prohibited Gardner's certification of the TUN.[12]

Next, Vali alleges that 49 C.F.R. Subpart H prohibited Gardner's certification of the TUN. Subpart H lists the documents required in a Product Safety Plan ("PSP"), which is defined as "a formal document [that] describes in detail all of the safety aspects of the product, including . . . analyses supporting its safety claims." 49 C.F.R. § 236.903. Vali alleges that "many of the

---

[12] The Program Standard's Safety Event Notification Matrix also does not prohibit the TUN certification. Instead, it details reporting requirements for various types of accidents. See WMSC Program Standard App. A (July 1, 2020) (listing the reporting requirements for events like serious injuries, hazardous-material spills, and improper door operation).

15

documents" she insisted were necessary for the TUN certification were "required to be included in WMATA's [PSP] for the Alexandria Railyard project." SAC ¶ 59 (citing 49 C.F.R. § 236.907). That may be so, but the regulation still addresses only the documents required for a PSP, not those required for a TUN. Thus, Subpart H also did not clearly prohibit Gardner from certifying the TUN.

The remaining laws Vali cites are similarly unhelpful to her cause. Those laws are about (1) the creation of state safety oversight programs ("SSOP") for public transit systems, see 49 U.S.C. § 5329 (requiring the creation of SSOPs), 49 C.F.R. §§ 674.27–29 (detailing the requirements for SSOP standards); (2) specific safety features required in railyards, see 49 C.F.R. §§ 236.301 *et seq.* (imposing standards for signals, track circuits, movable bridges, and other features); or (3) accident reporting requirements, see 49 C.F.R. § 674 Appendix (imposing reporting requirements for different types of accidents—*i.e.*, ones with property damage resulting from collisions, ones with serious bodily injuries, ones with minor bodily injuries, etc.). None of these laws, however, addresses the required documents or WMSC oversight process for a TUN.

Because none of these laws clearly reflects a policy prohibiting WMATA's conduct, Vali has failed to state a claim for wrongful termination in violation of public policy, and, therefore, the proposed amended complaint is futile.

## IV. Conclusion

For the reasons stated, the Court will deny Plaintiff's Second Motion to Amend with prejudice and dismiss the case. An Order accompanies this memorandum opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: November 3, 2023